**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

TED B. ANDERSON,

                    Plaintiff,

vs.                                                          Case No. 3:11-cv-3-J-32TEM

TRIAD INTERNATIONAL MAINTENANCE
CORPORATION

                    Defendant.
_____

## ORDER

Plaintiff, Ted B. Anderson, filed this action against Defendant, Triad International

Maintenance Corporation ("TIMCO"), claiming race discrimination in violation of 42 U.S.C.

Section 1981 and Title VII of the Civil Rights Act of 1964, as amended.  The case is before

the Court on TIMCO's motion for summary judgment.  (Doc. 30.)  The Court held oral

argument on May 23, 2012 (Doc. 49) and has considered TIMCO's motion and exhibits

(Docs. 30, 31), Anderson's response and exhibits (Docs. 37, 38), the argument of counsel,

case law, and all relevant facts and circumstances.

## I.     Background

TIMCO is a corporation in the business of providing aircraft maintenance, repair, and

overhaul services.  (Doc. 6 at ¶ 8.)  Anderson is a black man who was employed at TIMCO's

Lake City, Florida facility as a tool clerk from June 21, 2004 until December 6, 2007.  (Id. at

¶¶ 4, 7; Doc. 37 at 5.)  Anderson's duties consisted of distributing the necessary tools to

workers, checking the tools back in, and ensuring proper inventory of the tools.  (Doc. 6 at ¶ 9.)  Anderson was the only black tool clerk.  (Id. at ¶ 11.)

Near the end of 2007, TIMCO decided to lay off some of its workforce at the Lake City facility due to a slowdown in business and the loss of a major customer.  (Id.)  The reduction in force ("RIF") included the elimination of one tool clerk position.  (Id.)  To facilitate the RIF, TIMCO utilized evaluations which were completed for each employee.  (Doc. 37 at 1.)  The RIF evaluations for the tool clerks included three categories applicable to all employees (quality, work attitude, and teamwork) and nine tool clerk-specific categories related to safety and technical ability.  (Docs. 31-3 at 11; 30 at 4.)  These categories were scored on a four-point scale, with "1" being the best score and "4" being the worst.  (Docs. 37 at 2; 31-3 at 11.)  The evaluation also contained a space for a narrative description of the employee's overall performance, although this narrative was not calculated into the RIF score.  (Docs. 31-3 at 10; 30 at 4.)

Theresa Wingerd, the lead tool clerk, initially scored the tool clerk evaluations and gave Anderson better scores than two of the white tool clerks, William Whitfield, Jr. and James Wilhite.  (Doc. 37 at 1.)  Subsequently, Brian Booher, the Stores Manager, reviewed the evaluations with Wingerd.  (Id.)  After Booher provided his input, Wingerd changed Anderson, Whitfield, and Wilhite's scores, and Anderson ultimately received the lowest score of all of the tool clerks.  (Id. at 1-2.)  On November 27, 2007, TIMCO informed Anderson that he was selected for layoff effective December 28, 2007; however, Anderson terminated his employment with TIMCO on December 6, 2007.  (Id. at 4-5.)

2

On March 31, 2009, the Florida Commission on Human Relations issued a cause determination, based upon its investigator's finding that "there [wa]s reasonable cause to believe that [TIMCO] unlawfully discriminated against [Anderson] based on [his] race." (Doc 6 at 10, 16.)   Thereafter, on August 24, 2010, the Equal Employment Opportunity Commission issued a Letter of Determination, finding "reasonable cause to believe that a violation of Title VII of the Civil Rights Act of 1964, as amended ha[d] occurred." (Id. at 8.)[1] When conciliation efforts failed, the EEOC issued a Notice of Right to Sue on October 5, 2010. (Id. at 6.)   Anderson filed his complaint in this Court on January 27, 2011. (Id.)

## II.    **Standard**

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Although all facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party, Ramos-Barrientos v. Bland, 661 F.3d 587, 594 (11th Cir. 2011), "the nonmoving party cannot create a genuine issue of material fact through

---

[1] See infra Section IV for a discussion of the FCHR and EEOC determinations.

3

speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Vega v. Invsco Grp., Ltd., 432 F. App'x 867, 869-70 (11th Cir. 2011) (quoting Anderson, 477 U.S. at 249-50).

In an employment discrimination case, the plaintiff must produce evidence that is sufficient to support an inference that the employer based the employment decision at issue on an illegal criterion. Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997). "At the summary judgment stage, our inquiry is whether an ordinary person could reasonably infer discrimination if the facts presented remain unrebutted." Id. Thus, a plaintiff survives summary judgment "'if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action.'" Id. (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997)).

## III.    **Discussion**[2]

A plaintiff may prove discrimination through either direct or circumstantial evidence. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999). "Direct evidence of discrimination is evidence, that, 'if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th

---

[2] Anderson's race discrimination claims under Title VII and section 1981 are based upon the same evidence, have identical elements of proof, and use the same analytical framework, Vega, 432 F. App'x at 870 ("Both § 1981 and Title VII 'are subject to the same standards of proof and employ the same analytical framework.'") (quoting Bryant v. Jones, 575 F.3d 1281, 1307 (11th Cir. 2009)); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); thus, the Court analyzes them together.

Cir. 1999) (quoting Burrell v. Bd. of Trs of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)).  It "is composed of 'only the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some impermissible factor." Id. (quoting Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)).  Anderson has not offered direct evidence of discrimination.

When the plaintiff attempts to prove intentional discrimination using circumstantial evidence, the Court must apply the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Vega, 432 F. App'x at 870; Childress v. Caterpillar Logistics Servs., Inc., 369 F. App'x 95, 96 n.3 (11th Cir. 2010); Schoenfeld, 168 F.3d at 1267.

> Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  If he meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent.  The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory reason for its action.  If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination.

Schoenfeld, 168 F.3d at 1267 (internal citations omitted).

To establish a prima facie case of discrimination in a RIF case, a plaintiff must: (1) show that he was in a protected class and was adversely affected by an employment decision; (2) prove that he was qualified for his position or to assume another position at the

time of the discharge; and (3) produce sufficient evidence from which a factfinder could reasonably conclude that his employer intended to discriminate in reaching the discharge decision.[3] Lawver v. Hillcrest Hospice, Inc., 300 F. App'x 768, 773 (11th Cir. 2008); Rowell, 433 F.3d at 798; Benson, 113 F.3d at 1208.  TIMCO does not contest that Anderson satisfies the first two elements (Doc. 30 at 16); thus, "[a]t issue is whether [Anderson] can point to sufficient evidence to allow a reasonable juror to find discriminatory intent."  Standard, 161 F.3d at 1329.  To establish intent, Anderson must proffer evidence that could lead a factfinder to conclude that: (1) TIMCO consciously refused to consider retaining him because of his race; or (2) TIMCO regarded race as a negative factor in such consideration.  Padilla v. N. Broward Hosp. Dist., 270 F. App'x 966, 971 (11th Cir. 2008); Rowell, 433 F.3d at 798.

As evidence of discriminatory intent, Anderson offers the following:

- Anderson's superiors, both white, changed his, Whitfield, and Wilhite's RIF evaluation scores such that instead of the two white tool clerks receiving worse scores than Anderson, Anderson received the worst score.  (Doc. 37 at 1.) After the revisions, Whitfield and Wilhite earned identical scores of 2.58, while Anderson received a score of 2.66.  (Id. at 2.)

---

[3] "Many courts, in [RIF] cases, begin by considering whether it is being done in [a race] neutral way, presumably because a [RIF] generates adverse employment actions, which of course are quite lawful if not based on impermissible characteristics[.]" Rowell v. BellSouth Corp., 433 F.3d 794, 798 (11th Cir. 2005).

6

- TIMCO did not change the RIF evaluation scores of the other non-black tool clerk, Robert Hudson, who initially received a better overall score than Anderson. (Id. at 3.)

- TIMCO changed Anderson's RIF scores in the categories of: "Issues tools and tooling to authorized personnel and ensures proper transactions and paperwork are accomplished to maintain accurate records[;]" and "Ensures tools and tooling are stored in their proper location, secure and in an orderly manner" from "2" – meaning "Above Average" – to "3" – meaning "Below Average." (Docs. 37 at 2, 9; 30 at 4 n.3; 6 at 14.)  However, Anderson avers that he "scored well on the correlating categories in his past performance evaluations[;]" specifically, for "Quality of Work" in his evaluation that was conducted the same year as the RIF, Anderson earned a score of "2" for "work exceeds quality requirements for accuracy and neatness[,]" and in another performance evaluation, Anderson "exceeded" the required quality of work. (Doc. 37 at 2-3.)

- Anderson's RIF evaluation scores were worse than his past performance evaluation scores, which Booher conducted,[4] including the evaluation conducted just ten months prior to the RIF. (Id. at 3.)  Additionally, Anderson's

---

[4] In his deposition, Anderson testified that his prior supervisor, Darryn Whimpy, and Booher completed the evaluations. (Docs. 31-1 at 29, 34, 81, 90, 97-98; 39 at 10.)

averaged scores for the 2005 and 2006 performance evaluations were better than Whitfield and Wilhite's respective scores.  (Id.)

• "Though Booher and Wingerd were not supposed to consider aspects such as attendance – because such aspect was not included on the RIF form – 'dependability' was factored into the evaluation."  (Id. at 3-4.)   Anderson contends that "[n]owhere in the detailed evaluation categories was attendance a factor[,] . . . [y]et Wingerd singled that out for comment on the first page of the RIF evaluation."  (Id. at 4.)   Anderson claims that he never had an unexcused absence.  (Id.)

• Wingerd suggested on the RIF evaluation that Anderson had a bad attitude a few months prior; however, she had only been lead tool clerk for about four months when she scored the RIF evaluations, and Anderson asserts that he did not interact much with her at work – he states that he "only saw her a couple times a week for maybe a couple minutes at a time."  (Id.)  He also claims that  "[h]e always helped her with whatever she needed . . . ."  (Id.)

• When TIMCO informed Anderson that he was selected for layoff, no one told him that his RIF evaluation contributed to the decision or that human resources reviewed his RIF evaluation score.  (Id.)

• After TIMCO informed Anderson that it was eliminating his position, he trained Crysthyl Dacoycoy, a white female stock clerk.  (Id. at 4-5.)  He argues that although stock clerks are sometimes trained in some duties of the tool clerk

8

position, he taught Dacoycoy the duties of a full-time tool clerk, not the duties of a stock clerk who fills in.  (Id.)  Further, on Anderson's last day, TIMCO did not replace him with another tool clerk, "but instead [Dacoycoy] . . . replaced him."  (Id. at 5.)

- TIMCO gave Anderson the option to leave its employ prior to December 28, 2007; however, when Anderson applied for unemployment benefits, TIMCO informed the unemployment agency that Anderson quit, which Anderson claims TIMCO did to attempt to deny him benefits.  (Id.)  Comparatively, when TIMCO discharged Whitfield the following year, TIMCO did not oppose his application for unemployment compensation.  (Id. at 6.)

- When TIMCO discharged Robert Hudson and Robert Shaw (both employed in the tooling department and non-black) following Anderson's discharge, TIMCO informed them that they would be brought back, if possible, and subsequently rehired them.  (Id. at 1, 6.)  "At no time did anyone at TIMCO tell [Anderson] that he would be brought back to work if possible after the layoff."  (Id. at 6.)

- In early 2007, Anderson applied for the tool lead position, for which TIMCO hired Wingerd.  (Id. at 5.)  Wingerd was new to TIMCO, while Anderson had three-and-a-half years of tool experience there.  (Id. at 5-6.)  When Wingerd started, Anderson assisted her with tasks such as finding tools and using the "Magic" computer system.  (Id. at 6.)  Anderson contends that "[t]his decision was race-based and is reflective of the race-based decision of his layoff."  (Id.)

9

- TIMCO discharged Sharon Bentley, a black woman who is the mother of Anderson's children, weeks after TIMCO discharged Anderson and replaced her with Anna Johnson, who is white.  (Id. at 5.)

For the purposes of this analysis, the Court assumes, without concluding, that Anderson has established a prima facie case.  See Tran v. Boeing Co., 190 F. App'x 929, 933 (11th Cir. 2006); Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 334 (1st Cir. 1997) ("[W]e assume, without concluding, that Hidalgo has satisfied McDonnell Douglas . . . , mindful of the fact that 'the burden of making out a prima facie case is 'not onerous.''") (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991) (quoting Burdine, 450 U.S. at 253))).  Thus, the burden shifts to TIMCO to articulate a legitimate, nondiscriminatory reason for discharging Anderson.  "In general, the employer has an 'exceedingly light burden' in setting forth legitimate, non-discriminatory reasons for termination." Woodbury v. Sears, Roebuck & Co., 901 F. Supp. 1560, 1563 (M.D. Fla. 1995) (quoting Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983)).  "This is a burden of production, not persuasion." Standard, 161 F.3d at 1331.  "The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254 (internal citation omitted).

TIMCO asserts – and Anderson does not refute – that an anticipated "slow-down in business, including the loss of a major customer" necessitated a RIF.  (Docs. 30 at 3; 6 at 2.)  To determine employees for layoff, TIMCO utilized a RIF evaluation for each

10

employee.  (Doc. 30 at 3.)  "Leads" or immediate supervisors initially completed the RIF evaluations, and then the next level of management provided input, after which the evaluations were finalized.  (Id. at 4-5; Doc. 30-7 at 3.)

TIMCO avers that Booher had a more active role in collaborating with Wingerd to complete the tooling department RIF evaluations due to the short time Wingerd had been employed with the company, her limited interaction with some of the tool clerks, and that she had not yet conducted any performance evaluations for the tool clerks.  (Docs. 30 at 5; 30-6 at 5.)  "In contrast, Booher had been a Tool Clerk, had managed all four Tool Clerks for years and had participated in their past performance evaluations, and [Anderson] confirmed that Booher knew his job and tools well."  (Docs. 30 at 5; 31-1 at 18; 30-6 at 2.)  Once Booher and Wingerd agreed on the scores for each tool clerk based upon their observations and work experiences with them, Wingerd revised some of her initial scores.  (Docs. 30 at 5-6, 30-6 at 5.)  Booher testified that when TIMCO conducted the RIF evaluations, he did not know how many, if any, tool clerks would be discharged.  (Doc. 30-6 at 6.)  After TIMCO completed the evaluation process, it determined that it had to discharge one tool clerk, and since Anderson was the lowest-ranked tool clerk, TIMCO selected him for layoff.  (Docs. 30 at 6; 6 at 2-3.)

TIMCO has satisfied its "exceedingly light burden" to set forth a legitimate, nondiscriminatory reason for its actions.  See Vega, 432 F. App'x at 871 (finding that defendant's assertion that it demoted and ultimately terminated the plaintiff "in response to economic pressures" was a legitimate, nondiscriminatory reason for its decisions); Bibby v.

Drummond Co., 818 F. Supp. 325, 330 (N.D. Ala. 1993) (holding that the defendant "satisfactorily articulated a legitimate nondiscriminatory reason for its actions" where it presented evidence that it discharged the plaintiffs "pursuant to an age neutral rating system used to achieve a division wide RIF brought about by economic necessity"), aff'd, 20 F.3d 1174 (11th Cir. 1994).

Thus, the burden shifts back to Anderson to "create a genuine issue of material fact as to whether the reasons advanced are pretextual." Standard, 161 F.3d at 1332. "An employer's stated reason is not a pretext unless it is shown that both: (1) the reason [is] false; and (2) the real reason [is] unlawful." Vega, 432 F. App'x at 871; Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344,1349 (11th Cir. 2007).

Anderson may show pretext either directly, by persuading the Court that a discriminatory reason more likely motivated TIMCO, or indirectly, by showing that TIMCO's proffered explanation should not be believed. Vega, 432 F. App'x at 871; Childress, 369 F. App'x at 97; Standard, 161 F.3d at 1332. Whether directly or indirectly, Anderson "must show pretext with 'concrete evidence in the form of specific facts.' Mere 'conclusory allegations and assertions' will not suffice." Vega, 432 F. App'x at 871 (quoting Bryant, 575 F.3d at 1308). "Moreover, a plaintiff cannot recast the employer's articulated reason but rather, 'must meet it head on and rebut it.'" Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004)). Anderson may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in TIMCO's

proffered reasons "that a reasonable factfinder could find them unworthy of credence." Springer, 509 F.3d at 1348 (internal quotation omitted); Standard, 161 F.3d at 1333.

To show pretext, Anderson reiterates many of the same contentions that he asserts demonstrate discriminatory intent: (1) there was an "unexplained drop-off in [Anderson]'s evaluation scores" in that he "scored better on his past evaluations[;]" (2) TIMCO "relied on 'dependability' as a non-existent criterion to downgrade his RIF evaluation score[,] . . . tantamount to digging up dirt[;]" (3) Wingerd's comments on the RIF evaluation suggested that Anderson had a bad attitude, despite Wingerd's short time as lead tool clerk and lack of interaction with Anderson; (4) TIMCO did not tell Anderson that anyone in HR reviewed his RIF evaluation score, and the evaluations themselves do not indicate that such process took place; (5) he was "inexplicably passed over for the Tool Lead position in favor of . . . Wingerd[;]" and (6) Dacoycoy "effectively replaced" Anderson.  (Doc. 37 at 11-14.)

In response to Anderson's contention that his RIF evaluation is inconsistent with past evaluations, TIMCO asserts that it used a new evaluation for the RIF because it did not believe that the past evaluations were effective.  (Docs. 30 at 3-4; 30-2 at 2-3.)  Specifically, TIMCO avers that "the prior evaluation scores were generally inflated, . . . not an accurate reflection of the employees' true performance[,]" and used a five-point scale where "3" was "average;" thus, supervisors gave a score of "average" to most employees too easily.  (Docs. 30 at 3-4; 30-2 at 3.)  For these reasons, in addition to the fact that TIMCO performed the most recent evaluations "nearly eleven months" prior to the RIF, TIMCO did not factor the prior evaluations into the RIF.  (Docs. 30 at 3; 30-2 at 3.)

13

On Anderson's prior evaluations, his supervisors gave him mostly average scores, and several handwritten comments therein indicate areas in which he needed to improve. (See Doc. 31-3 at 16-25.)  For example, some of the comments state that Anderson "often needs clarification," including sometimes needing clarification for "tasks he has performed in the past," "needs to focus on keeping a good inventory of his area," and "needs to be more aware of certain procedures."  (Id. at 18, 20, 24.)  Additionally, the categories in the prior evaluations do not mirror those in the RIF evaluation; thus, this factor, combined with the option to choose "average" on the prior evaluations, could result in lower scores on the RIF evaluation.  (Id. at 16-25.)

In Rowell v. BellSouth Corporation, the Eleventh Circuit found that the fact that an employee received worse scores on a RIF evaluation compared to an annual review was not evidence of discriminatory motive:

> [O]nly four of the six competency areas used in the [RIF] were also used in the regular job performance evaluations . . . . Thus, that Rowell received different scores on his annual review and the review done for purposes of reduction does not provide evidence of discriminatory animus.  The facts that the annual evaluations covered only that year's performance whereas the reduction in force evaluations were to take into consideration the employee's whole experience also make the comparison not relevant for purposes of determining whether there was discriminatory intent.

Rowell, 433 F.3d at 799; see also Hidalgo, 120 F.3d at 336-37 (stating that it was doubtful that the evidence demonstrated pretext, even where the plaintiff offered evidence of a prior evaluation – prepared just over two months before the adverse employment action at issue

14

– "in which he received the best possible ratings in all categories,"[5] and "even if [the plaintiff] fashioned a triable issue as to pretext, there was no significantly probative evidence to show that the pretext masked . . . discrimination.") (internal quotations omitted).  Following the Eleventh Circuit's reasoning in Rowell, that Anderson may have scored marginally better on the annual evaluations than the RIF evaluation does not sufficiently demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in TIMCO's proffered reasons that a reasonable factfinder could find those reasons unworthy of credence.

TIMCO next asserts that the revisions to Anderson's scores are not evidence of pretext because – in addition to the reasons for the close collaboration between Booher and Wingerd – (1) Booher used the same collaborative process for all five of his departments; (2) within Booher's departments, several other employees' scores were revised, (3) and a review of all of the RIF evaluations demonstrates that changes were made without regard to race.[6]

---

[5] "In fact, the evaluation indicated that he 'stands out as being among the best . . . known' and that he 'will qualify for advancement beyond the next higher job classification or level of responsibility.'" Hidalgo, 120 F.3d at 336.

[6] TIMCO submits: "In looking at the final RIF evaluation scores for Booher's department as a whole, there is no correlation between race and the employee rankings. For example, Booher was the manager for 23 Customer Materials Clerks.  The RIF evaluation scores for these employees resulted in two of the five Black Customer Materials Clerks being ranked first and second highest.  The two lowest scoring Customer Materials Clerks were White and Black and both were selected for layoff.  TIMCO employed Black employees in the job categories of Stock Clerks, Stock Clerk Leads and Shipping Clerks, and none of the Black employees in those categories were ranked last, or even second to last, such that they were likely to be subject to layoff.  In several instances, Black employees scored higher than their White counterparts with respect to the RIF evaluation scores."  (Doc. 30 at 8 (internal

(Doc. 30 at 7.)  TIMCO states:

> Specifically, Stock Clerk, Arneta Paige (Black) had one of her
> scores improved from a "2" to a "1."  Both before and after this
> change, Paige ranked second above two White employees in
> her department who had overall scores of "2" and "2.53.["]  This
> supports that these changes were made for accuracy, and not
> to affect the departmental rankings for layoff selection because
> of race or otherwise.  In contrast, and like Plaintiff, there were
> several White employees in Booher's department who had
> their draft evaluation scores lowered. Specifically, Customer
> Materials' Clerk, Kelly Smith (White), had two of her initial
> evaluation scores of "2" changed to the lower score of "3."
> Customer Materials Clerk, Michael Brittain (White), had one of
> his scores of "2" lowered to the score of "3." Customer
> Materials Clerk, Bonnie Cooke (White), had two "2"s lowered
> to "3"s, and Customer Materials Clerk, Mildred Hensley
> (White), had six scores of "2" lowered to "3"s, and two "1"s
> changed to "2"s.

(Id. (internal citations omitted).)  TIMCO submits evidence that "[t]he other TIMCO managers

also engaged in a collaborative process when conducting the 2007 RIF evaluations," and at

least thirty-nine evaluations include revisions like those at issue, several of which resulted

in either lowering white employees' scores or raising black employees' scores.  (Id. at 8; Doc.

30-7 at 5.)  Further, Michele Monroe, TIMCO's human resources manager, testified that once

the supervisors completed the RIF evaluations, she "performed a statistical evaluation to

determine whether there was any apparent disparate impact to protected categories of

employees" and "detemin[ed] that the racial make-up of the employee population would

_____

citations omitted).)

remain the same after the RIF[.]"[7]  (Doc. 30-7 at 2, 4, 8.)

Although Anderson attempts to use the fact that he was the only black employee in the tooling department – and therefore TIMCO discharged "100 percent" of the black employees in his department – as evidence of racial discrimination, viewing TIMCO's post-RIF racial composition as a whole paints a different picture: The racial composition was the same before and after the RIF (specifically, seventy-nine percent White; ten percent Black; nine percent Hispanic; and two percent Asian).  (See id. at 8.)  The district court's analysis in Bibby v. Drummond Company is instructive:

> Plaintiffs' statistical evidence is not probative of age discrimination. The "statistics" put forward by the plaintiffs take only selected evidence from the entire RIF.  Plaintiff Bibby testified that at the Kellerman No. 1 mine there were 20 supervisors prior to the RIF.  Eight of those supervisors were over 40 years old.  Only two of the employees age 40 or older were retained after the RIF while all of the supervisors under age 40 were retained.  Thus, 75% of the supervisors over age 40 at that particular site were retained, and none of the supervisors under age 40 were terminated at that site.  In order to show discrimination, the court must look to the results of the RIF on the entire workforce affected.  The rating system applied across the board to Drummond's surface mining operations.    The employees were rated against other employees in the individual job categories at all surface mines.  Thus, the appropriate statistical comparison is to the above-ground workforce as a whole.  The average age of defendant's above-ground salaried workforce actually rose after the RIF.  The only permissible inference from these facts is that Drummond's rating system did not have a discriminatory

---

[7]  Anderson contends that TIMCO did not tell him that HR reviewed his RIF evaluation score and that the evaluations themselves do not indicate that such review took place; however, Anderson fails to articulate how, if true, this demonstrates pretext.

impact on employees over 40 years of age.

Bibby, 818 F. Supp. at 329-30; see also Hudson v. S. Ductile Casting Corp., 849 F.2d 1372, 1375, 1375 n.5 (11th Cir. 1988) (affirming summary judgment in favor of the employer where the evidence weighing against a finding of racial and age discrimination included the fact that after the RIF, "the resulting changes in the racial and age composition of the salaried workforce were nominal" – "[t]he percentage of black salaried employees decreased from 15.6% to 12% while the percentage of salaried employees over forty years of age increased from 59% to 64%.").

Thus, Anderson fails to create an issue of fact regarding whether the change in his score was racially-motivated, or that TIMCO's explanation should not be believed. Additionally, when questioned in his deposition regarding what evidence he had, or what facts he could point to, showing that the revisions were race-based, Anderson admitted that he had none, other than the evaluations themselves. (Doc. 31-1 at 34-36.) See Rowell, 433 F.3d at 797 ("Rowell testified that he believed Robitzsch had discriminated against him during the ranking process. Rowell admitted, however, that other than the ranking scores, Robitzsch had never said or done anything to suggest he would discriminate on the basis of age.") (internal citation omitted). Anderson's belief that his scores should have remained higher than Whitfield and Wilhite's does not demonstrate pretext.[8] Standard, 161 F.3d at

_____

[8] Although Anderson was not familiar with Wilhite's performance (Doc. 31-1 at 61), Anderson admitted that Whitfield and Hudson were good workers. In his deposition, when asked about the performance of the other tool clerks, Anderson testified: "Mr. Whitfield, he's a good worker. He knows his tooling. He knows tooling real good," "Robert Hudson . . . He's

18

1333 ("The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons."); Rowell, 433 F.3d at 799 ("Rowell's personal belief that he was more qualified is not sufficient to demonstrate discriminatory intent."); Tran, 190 F. App'x at 933 (stating that the plaintiff's disagreement with the employer's "assessment is insufficient to establish pretext").[9]  So long as race played no part in TIMCO's decision to discharge Anderson,[10] it is not within this Court's purview to second-guess TIMCO's business judgment that Anderson's performance merited the scores that his supervisors gave him. Godby v. Marsh USA, Inc., 346 F. App'x 491, 494 (11th Cir. 2009) ("To the extent Godby argues that other employees would have been more appropriate choices for the RIF or takes issue with the vetting process itself, we do not second-guess the business judgment of employers."); Rowell, 433 F.3d at 798 ("It is by now axiomatic that we cannot second-guess the business decisions of an employer."); Beaver v. Rayonier, Inc., 200 F.3d 723, 728 (11th Cir. 1999) ("It

---

a good worker. He's one of the good workers out there," and "I ain't really see no weakness in Robert."   (Doc. 31-1 at 56-57, 59, 61.)

[9] See also Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.")

[10] See Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

is not our role to second-guess Rayonier's decision to respond to a loss in sales . . . by cutting its workforce."); see also Padilla, 270 F. App'x at 972 ("[A] subjective reason for an employer's action can be as legitimate as any other reason."); Bibby, 818 F. Supp. at 329 ("Even if Drummond's rating system was not the fairest method for evaluating its employees, this fact alone is not evidence of . . . discrimination[.]").[11]

In response to Anderson's contention that TIMCO "relied on 'dependability' as a non-existent criterion to downgrade his RIF evaluation score[,]" TIMCO asserts that this argument is a red herring. (Doc. 30 at 22.) TIMCO avers that "[a]lthough Wingerd noted the on-going attendance issues on the narrative portion of the RIF evaluation, it is undisputed that this information was not directly calculated into the score used to rank the employees." (Id.; Doc. 30-6 at 7.) Further, TIMCO asserts that although "the RIF form did not have a specific category for attendance, [Anderson]'s attendance record influenced his supervisors' evaluation of him concerning specific criteria such as work attitude, quality, and performance of technical duties[;]" however, "TIMCO . . . never represented that [Anderson]'s attendance issues had anything to do with why Wingerd's draft scores were amended during the collaborative process." (Docs. 30 at 23; 30-6 at 7-8.)

Although Anderson avers that this is "tantamount to digging up dirt," the cases

---

[11]  This reasoning also applies to Anderson's contention that Wingerd's comment about his "bad attitude" is evidence of pretext. There is no evidence that the comment was racially-motivated, and the Court does not second-guess Wingerd's subjective opinion of Anderson's attitude as his supervisor, so long as that opinion was not born of racial discrimination. Because there is nothing indicative of racial animosity, Wingerd's comment is not evidence of pretext.

Anderson cites in support of this assertion are distinguishable from and inapplicable to this case. Unlike Giardina v. Lockheed Martin, Corp., No. Civ.A. 02-1030, 2003 WL 21634934 (E.D. La. July 3, 2003), Ponce v. Cingular Wireless, L.L.C., No. CIV 03-21939, 2005 WL 5454213 (S.D. Fla. Nov. 17, 2005), and Pullom v. U.S. Bakery, 477 F. Supp. 2d 1093 (D. Or. 2007), there is no evidence that TIMCO was "digging up dirt" on Anderson or that TIMCO disciplined Anderson for his attendance issues "in an effort to build a case to terminate [him.]" Instead, the evidence shows that Anderson had significant attendance issues to the extent that TIMCO could have terminated Anderson on that basis prior to the RIF, but did not:

> On six separate occasions Plaintiff received progressive disciplinary action for being tardy or absent from work. In January 2006, Plaintiff's poor attendance merited discharge under this policy, but Booher intervened and specifically requested the Department Director to not terminate Plaintiff's employment and, instead, to issue him a Final Warning.

(Docs. 30 at 12 (internal citations omitted); 30-6 at 7.) Thus, Anderson's averment that TIMCO improperly considered his attendance issues does not sufficiently demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in TIMCO's proffered reasons to render them unworthy of credence, and is therefore not demonstrative of pretext.

In response to Anderson's argument that hiring Wingerd for lead tool clerk, instead of Anderson, demonstrates pretext, TIMCO states:

> Plaintiff's only proffered evidence that race was a factor in the decision to hire Wingerd as the Lead is that he is Black, she is White, and in Plaintiff's opinion, he should have been hired as Lead. TIMCO selected Wingerd over Plaintiff for the legitimate

21

> reasons that she had management and tooling experience, she performed better during her interview and Plaintiff had an attendance issue, which is not what is needed in a Lead.
>
> Plaintiff has offered no evidence that these legitimate reasons were pretext for discrimination, and . . . he cannot substitute his business judgment for TIMCO's in an effort to show pretext. He has also not demonstrated any connection between this June 2007 hiring decision, and the decision to select Plaintiff for layoff.

(Doc. 30 at 24-25; see Doc. 30-6 at 4.)

The Eleventh Circuit rejected an argument similar to Anderson's in Springer v. Convergys Customer Management Group Inc., in which the plaintiff alleged a racially-discriminatory failure to promote under section 1981.  Springer, 509 F.3d at 1345.  The plaintiff contended that she was more qualified for the position; however, the Eleventh Circuit found that the plaintiff provided no evidence that the employer's reliance on the other candidate's superior qualifications to promote her, instead of the plaintiff, was a mask for racial discrimination:

> "Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext . . . ." Denney, 247 F.3d at 1185. While Convergys' decision to promote Susan Johnson rather than Plaintiff was based on Patrice London's subjective view of whose qualifications were superior for the position, "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." Id. at 1186.  We find that Patrice London, in her testimony describing her first-hand experience with the candidates, provided a sufficiently specific factual basis for her opinion that Susan Johnson was the more qualified candidate

> for the promotion.
>
> . . . .
>
> We conclude that the promotion of Susan Johnson over Plaintiff, based on their supervisor's view of their relative qualifications, was a reasonable business decision. "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir.2001) (citation and internal quotation marks omitted).

Id. at 1349-50.

Here, Anderson has not submitted evidence to contradict TIMCO's evidence that: Wingerd had managerial experience that Anderson lacked; Wingerd performed better during her interview; or Anderson had attendance issues unbecoming of a manager. To demonstrate pretext, "a plaintiff must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Springer, 509 F.3d at 1349 (internal quotation omitted). Further, Anderson's personal opinion that he was the better candidate for lead tool clerk is not enough to demonstrate pretext, and this Court does not second-guess TIMCO's business judgment that Wingerd was the appropriate choice. See, e.g., Childress, 369 F. App'x at 97 ("Childress simply argues that she was the more qualified candidate for the job[, but her] own disagreement with CLS's selection criteria is insufficient to show pretext.").

Finally, Anderson argues that a question of fact remains as to whether he was

23

effectively replaced by Crysthyl Dacoycoy, a white woman.  TIMCO, however, submits evidence that Dacoycoy was already employed by TIMCO as a stock clerk at the time of the RIF, and although she relieved Anderson on his last day at TIMCO, she did not replace him as a tool clerk.  (Docs. 30 at 24; 30-6 at 8.)  TIMCO avers that "[t]he fact that Dacoycoy was initially a temporary employee, and then hired into a vacant Stock Clerk position in October 2007 (near the time [Anderson]'s Tool Clerk position was eliminated) says nothing about pretext." (Doc. 30 at 24 n.13.)  Additionally, TIMCO asserts that it "did not hire any Tool Clerks to replace [Anderson], and in fact, two months after [Anderson] was notified of the RIF, TIMCO laid off Wilhite, and in 2009, it laid off Whitfield."  (Id.; Doc. 30-6 at 8.)

Thus, the evidence demonstrates that TIMCO eliminated Anderson's tool clerk position and did not hire anyone as a tool clerk to replace him.  (See, e.g., Docs. 30-6 at 8; 30-9 at 2.)  Additionally, TIMCO subsequently discharged two white tool clerks who scored better than Anderson on the RIF evaluation.  (Doc. 30-6 at 8.)  Even if TIMCO moved Dacoycoy into a full-time position around the time that it eliminated Anderson's position, TIMCO submits evidence that the position it gave her – stock clerk – is part of a different skills group, on a different shift, earns "notably less money," and performs different duties from a tool clerk, despite filling in when there is not a tool clerk present.  (Docs. 30 at 14; 30-9 at 2; 30-6 at 8.)

The Eleventh Circuit rejected a similar argument in Hudson v. Southern Ductile Casting Corporation.  There, in support of his race discrimination claim, the plaintiff asserted that: (1) he was "replaced" by a white man; and (2) the defendant hired six white employees

shortly after discharging him.  <u>Hudson</u>, 849 F.2d at 1376.  The Eleventh Circuit held that the plaintiff "failed to make out a prima facie case of race discrimination[,]" and in reaching this conclusion, stated:

> In a further effort to bolster his case, Hudson contends that he was "replaced" by a white man, Phil Allen. There is no evidence to support such an assertion. In his deposition, Hudson admits that Allen already served as leadman in the coreroom, not coreroom foreman, at the time Hudson was terminated and that Allen remained in that position afterwards. He also claims that Southern Ductile hired six white employees shortly after he was discharged. However, he does not allege the positions these employees assumed within the company or that any one of them took over his job as coreroom foreman.

<u>Id.</u> at 1376.

Similarly, in <u>Beaver v. Rayonier, Inc.</u>, the plaintiff sought to demonstrate that a RIF was pretextual by pointing to evidence that the defendant hired some younger employees around the time that it terminated his employment.  <u>Beaver</u>, 200 F.3d at 728.  Specifically, he averred that the defendant hired ten hourly employees in the maintenance department before the RIF and twenty more shortly after the RIF.  <u>Id.</u>  This evidence, he argued, "was sufficient for a jury to infer [that] the RIF was a pretext to get rid of older workers."  <u>Id.</u>  The Eleventh Circuit disagreed, stating that the fact that a company eliminated some positions in a RIF while simultaneously hiring workers outside of the protected class in other positions was not sufficient to show that the RIF was pretextual.  <u>Id.</u>  The court of appeals stated: "A plaintiff must . . . show that the new positions were similarly situated to those that were eliminated in the RIF. . . .  Beaver did not show that the new positions for which Rayonier

hired hourly employees in the maintenance department were similarly situated to the positions eliminated in the RIF." Id. Thus, the Eleventh Circuit held that the plaintiff failed to demonstrate that the decision to conduct the RIF was a pretext to conceal age discrimination. Id. at 729.

Further, even if other employees, including Dacoycoy, took over some of Anderson's duties after TIMCO discharged him, there is nothing improper about such a redistribution of work once an employee is discharged. See Verna v. Public Health Trust of Miami-Dade Cnty., 539 F. Supp. 2d 1340, 1354 (S.D. Fla. 2008) (holding that the plaintiff failed to establish a prima facie case of race discrimination in the context of a RIF and stating that when the plaintiff's position was eliminated, "no one was hired to replace her[,]" and "her duties as the Patient Safety Officer were re-distributed to a physician who was already on staff"). Rather, it is expected that when an employee leaves a company, other employees will assist in filling any resultant void. Thus, Anderson fails to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in TIMCO's proffered reasons for his discharge such that they are unworthy of credence and therefore, as a matter of law, cannot demonstrate pretext.[12]

---

[12] For a case demonstrative of inconsistencies sufficient to preclude summary judgment, see Benson v. Tocco, Inc., 113 F.3d 1203 (11th Cir. 1997). In Benson, the defendant, Tocco, Inc., claimed that one of the plaintiffs, Benson, was not qualified for a new position created after his termination because he had not demonstrated any clerical or computer-related skills; however, Tocco did not offer any evidence that it made any determination regarding Benson's clerical or computer capabilities, and Tocco eventually filled the position with someone who "had no greater clerical or computer expertise than Benson[.]" Benson, 113 F.3d at 1211-12; see also Howard v. BP Oil Co., Inc., 32 F.3d 520, 527 (11th Cir. 1994)

IV.      **EEOC and FCHR Determinations**

Although neither party discusses the EEOC or FCHR determinations at length in their summary judgment papers, TIMCO filed a motion in limine directed, in part, at exclusion of the determinations at trial (Doc. 32).  The Court also discussed them at length during oral argument.  While such determinations are "ordinarily" admissible, it is still within the trial court's sound discretion whether to admit them. Goldsmith v. Bagby Elevator Co, Inc., 513 F.3d 1261, 1288 (11th Cir. 2008); Lee v. Exec. Airlines, Inc., 31 F. Supp. 2d 1355, 1357 (S.D. Fla. 1998) ("The decision to admit or exclude EEOC Letters of Determination is thus within the discretion of the trial judge; this is particularly important as 'EEOC determinations are not homogenous products; they vary greatly in quality and factual detail.'") (quoting Johnson v. Yellow Freight Sys., 734 F.2d 1304, 1309 (8th Cir.1984)).  Although "the probative value of an EEOC determination ordinarily outweighs any possible prejudice to the defendant in a bench trial, . . . there may be some circumstances in which the probative value of an EEOC determination is trumped by the danger of creating unfair prejudice in the minds of a jury." Goldsmith, 513 F.3d at 1288 (internal quotation omitted); Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 791 (11th Cir. 1999) ("Although trial courts admit EEOC determinations in bench trials, this liberal admissibility rule does not apply to jury trials. . . . [T]he district court must make the admissibility determination on an individual basis,

(finding that the fact that BP's district manager was unaware that BP had a nepotism policy – which BP claimed it followed in awarding gas stations to white applicants – was an "apparent inconsistency, [which, when] viewed against the backdrop of BP's unwritten, shifting criteria, would enable a reasonable jury to find that BP, in fact, had no [such] policy . . . and that BP's explanation . . . [wa]s false").

considering the evidence's probative value and the danger of unfair prejudice."). Relevant factors to consider include whether: (1) the determination contains legal conclusions in addition to factual content; (2) questions of trustworthiness are raised pursuant to Rule 803(8)(c), Federal Rules of Evidence; and (3) the evidence presents prejudice issues under Rule 403. Barfield v. Orange Cnty., 911 F.2d 644, 650 (11th Cir. 1990); Cormack v. N. Broward Hosp. Dist., No. 08-61367-CIV, 2009 WL 2848998, at *3 (S.D. Fla. Aug. 28, 2009); see Blanton v. Univ. of Fla., 273 F. App'x 797, 804 (11th Cir. 2008) (discussing factors (2) and (3)).

First, the brief, two-page EEOC letter of determination states in a conclusory fashion that "the evidence obtained during the investigation establishes that there is reasonable cause to believe that a violation of Title VII . . . has occurred." (Doc. 32-6 at 3-4.) In Cormack, the district court held that nearly identical language in a letter of determination was "not simply a finding of fact but a legal conclusion that is likely to confuse a jury into thinking that the decision as to whether discrimination occurred has already been made by a federal agency." Cormack, 2008 WL 2848998, at *1. Although the FCHR investigative memorandum is more detailed than the EEOC determination, it also contains a similar legal conclusion that "there is reasonable cause to believe that [TIMCO] unlawfully discriminated against [Anderson] based on . . . race." (Doc. 32-5 at 10.)

Second, there are issues of trustworthiness with regard to both determinations. See McClandon v. Heathrow Land Co. Ltd. P'ship, No. 6:08-cv-35-Orl-28GJK, 2010 WL 336345, at *4 (M.D. Fla. Jan. 22, 2010) ("[R]eports of Government agencies are subject to scrutiny

by the court, and those lacking trustworthiness should be excluded from evidence."). The EEOC determination reaches its conclusion without referencing the evidentiary basis for that conclusion or the extent of the investigative efforts (i.e. what witnesses, if any, the investigator interviewed or what documents he reviewed). (See Doc. 32-6 at 3-4.) Lee, 31 F. Supp. 2d at 1357 ("We do not believe that conjecture as to which [evidence] provided the basis for the EEOC determination is acceptable . . . . [T]he inability to determine the factual findings providing the basis for the EEOC letter may well prejudice Defendants, both in terms of the fact that rebuttal of the conclusion's specific facts is impossible and cross-examination of the determination is unavailing.  Absent providing any details or otherwise describ[ing] 'the evidence' relied upon, the Letter of Determination possesses minimal probative value.") (internal citations omitted).  Although the FCHR memorandum is better at setting out an evidentiary basis, it is nonetheless unclear what the scope of the FCHR's investigation was and what specific evidence the investigator considered. (See Doc. 32-5.)  Additionally, the FCHR memorandum contains factual and mathematical inaccuracies, drawing into question the care taken by the investigator in reaching her conclusion and resulting in trustworthiness concerns. (See Doc. 32-5 at 6-9.)

Third, given the conclusory nature of the determinations and other issues noted above, if the Court admitted the EEOC and FCHR determinations, there is a serious risk of unfair prejudice.  The determinations make legal conclusions – the EEOC determination doing so without referencing an evidentiary basis – and "it [would] be difficult for the jury to exercise their responsibilities as the finders of fact in evaluating the evidence before them."

29

Lee, 31 F. Supp. 2d at 1358.  "[I]t is distinctly possible that the jury [would] attach undue weight to the authoritative and personalized conclusions of the . . . inspector, thus creating unfair prejudice."  Id. at 1358; Walker v. NationsBank of Fla. N.A., 53 F.3d 1548, 1554 (11th Cir. 1995) ("The admission of an EEOC report, in certain circumstances, may be much more likely to present the danger of creating unfair prejudice in the minds of the jury than in the mind of the trial judge, who is well aware of the limits and vagaries of administrative determinations and better able to assign the report appropriate weight and no more.") (internal quotation omitted); Williams v. Nashville Network, 132 F.3d 1123, 1129 (6th Cir. 1997) ("A strong argument can be made that a jury would attach undue weight to this type of agency determination, viewing it as a finding of discrimination . . . rather than as a mere finding of probable cause."); Roberts v. Wal-Mart Stores, Inc., Civil Action No. 95-0059-H, 1997 WL 38138, at *2 (W.D. Va. Jan. 28, 1997) ("Because this determination comes with the imprimatur of government approval, a jury could readily give the EEOC's conclusions greater weight than they should otherwise be accorded, thus usurping the role of the jury as a factfinder.").  For these reasons, if this case were to reach trial, the Court would likely exclude the EEOC and FCHR determinations.[13]

---

[13]   Anderson would not be prejudiced by this ruling because he would have "a full opportunity to present to the jury all [of] the evidence . . . submitted to the [agencies,]" including any evidence in the EEOC and FCHR files, so long as it was otherwise admissible. See Paolitto v. John Brown E.&C., Inc., 151 F.3d 60, 66 (2d Cir. 1998) ("[B]ecause the court allowed Brown to introduce any evidence in [the investigative] file so long as it was otherwise admissible, Brown was not prejudiced by the exclusion of the file as a whole."); Roberts, 1997 WL 38138, at *2 ("Introduction of individual supporting documentation within the EEOC file may be appropriate if otherwise permitted under the Federal Rules of Evidence.").

In any event, in <u>Kincaid v. Board of Trustees</u>, the Eleventh Circuit stated that, in considering a summary judgment motion, courts are "not required to defer or make reference to" agency determinations; instead, the court must conduct a <u>de novo</u> review of the plaintiff's claims. <u>Kincaid v. Bd. of Trs.</u>, 188 F. App'x 810, 817 (11th Cir. 2009). In that case, Kincaid, a sixty-six-year-old white male brought an action against a historically African American college for race and age discrimination after the college terminated him. <u>Id.</u> at 812-13. Prior to Kincaid filing suit in federal court,

> [t]he EEOC issued a right-to-sue letter and determined that a violation had occurred, stating: 'I have determined that Respondent discriminated against Charging Party with respect to subjecting him to a hostile work environment and non-renewal of his employment contract because of his race, White, and age, over 40, in violation of Title VII . . . .'

<u>Id.</u> at 813.

After the magistrate judge granted summary judgment in favor of the college, Kincaid appealed. <u>Id.</u> at 814-15. Although the magistrate judge had initially ruled that the EEOC determination was inadmissible, he subsequently reversed that decision. <u>Id.</u> at 817. "Nevertheless, after the reversal, the magistrate judge did not mention the EEOC determination in the order granting summary judgment . . . ." <u>Id.</u> Thus, Kincaid argued that the magistrate judge erred in excluding the determination. <u>Id.</u>

In holding that the magistrate judge did not abuse his discretion, the Eleventh Circuit stated:

> First, the magistrate judge was not required to defer or make reference to the EEOC determination; the magistrate

31

> judge had to conduct a de novo review of the claims.  The EEOC determination merely stated that the EEOC concluded that [the college] discriminated against Kincaid and others based on age and race; it did not provide analysis as to why it reached that conclusion.  Upon review of the evidence, the magistrate judge determined that Kincaid failed to raise a genuine issue of material fact as to whether [the college] discriminated against him.  We are unpersuaded by Kincaid's contention that the EEOC determination raised a genuine issue of material fact regarding his claims of discrimination.

Id. (internal citations omitted). Thus, the Eleventh Circuit affirmed the grant of summary judgment.  Id.; see also Walker, 53 F.3d at 1554 (stating that notwithstanding Congress's creation of the EEOC, "final responsibility for enforcement of the federal employment discrimination laws is vested in the federal courts").

Here, although the EEOC and FCHR investigators found reasonable cause to believe that discrimination occurred, after this Court's de novo review of all of the evidence, summary judgment is due to be granted.[14]

Accordingly, it is hereby

**ORDERED:**

1.  Defendant's Motion for Summary Judgment (Doc. 30) is **GRANTED**.

2.  Defendant's Motion to Strike (Doc. 39) is **DENIED** as moot.

3.  The Clerk is directed to enter judgment in favor of defendant Triad International

---

[14]  Because the Court is granting summary judgment, TIMCO's motion to strike (Doc. 39) is moot; however, for the purposes of this summary judgment analysis, the Court has considered Anderson's supplemental affidavit (Doc. 38-14).

Maintenance Corporation and against plaintiff Ted B. Anderson and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 6th day of June, 2012.

_____
TIMOTHY J. CORRIGAN
United States District Judge

jk.
Copies:

counsel of record